PEOPLE'S BANK LIQUIDATING CORPORATION *et al. v.* BEASHEA DRAINGE DIST. *et al.*

(In Banc. Feb. 11, 1946. Suggestion of Error Overruled Feb. 25, 1946.)

[24 So. (2d) 784. No. 35921.]

W. I. Stone, of Coffeeville, W. J. Evans and Paul Moore, both of Calhoun City, and J. D. Guyton, of Kosciusko, for appellants, Peoples Bank Liquidating Corporation, W. R. Pollard and J. G. and R. L. Holp.

510.

Hillman & McCraw, of Philadelphia, and **May & Byrd**, of Jackson, for appellant, Bank of Philadelphia.

**Creekmore & Creekmore**, of Jackson, for appellant, Cecil E. Inman.

Snow & Covington, of Meridian, and **W. H. Sanford, Jr.,** of Philadelphia, for appellees.

**J. D. Guyton,** of Kosciusko, for appellants, R. L. and
J. G. Holp, in response to memorandum of the Court.

**W. I. Stone,** of Coffeeville, and **Paul Moore** and **W. J. Evans,** both of Calhoun City, for appellants, Peoples Bank Liquidating Corporation and W. R. Pollard, in response to memorandum of the Court.

**Hillman & McCraw,** of Philadelphia, and **May & Byrd,** of Jackson, for appellant, Bank of Philadelphia, in response to memorandum of the Court.

516

518

**McGehee, J.**, delivered the opinion of the court.

This suit was brought during the year 1936 by the appellants, as holders of certain unpaid bonds of a first series issued by the Beashea Drainage District in Neshoba County, and the complaint is that a great portion of the funds of the district were unlawfully diverted by the commissioners and the depository bank, which should have been applied to the payment of such bonds. A decree was asked against the district in its corporate capacity, the commissioners thereof and the sureties on their official bonds, the Bank of Philadelphia as the de facto depository of the funds in question and the holders of the unpaid bonds of a second series whose rights were asked to be subordinated to those of the complainants in the recovery sought.

The trial court rendered a decree wherein any and all relief prayed for was denied to the complainants as against the commissioners and the sureties upon their official bonds, but which was against the district in its corporate capacity for the amount of the indebtedness sued on, and against the Bank of Philadelphia for the sum of $15,975.20, and in favor of the complainants as to the priority claimed by them in such recovery, as between themselves and the holders of the unpaid bonds of the second series. Also, the decree was in favor of the cross-complainant, Cecil Inman, against the district, on some of the bonds of the first and second series held by him, but not for the full amount actually due, and it provides that the said Inman shall share on an equal basis with the complainants in the recovery against the said bank only as to the bonds of the first series held by him. From the adverse features of this decree, the complainants, Peoples Bank Liquidaing Corporation et al., and the defendant Bank of Philadelphia, and Inman, respectively, have prosecuted an appeal.

This drainage district was organized in the year 1919, under Chap. 195, Laws of 1912, as amended by Chap. 269, Laws of 1914. The first series of bonds was issued on April 1, 1920, in the principal sum of $33,000, payable in annual installments over a period of thirty years, bearing interest at 6% per annum from date, and making a total indebtedness of $76,080, to be collected during the life of the said bonds, against the assessed benefits to the real property in the district of only $64,399.34. In other words, the amount agreed to be paid to the bond holders was $11,740.66 more than could ever be collected from the property owners of the district for that purpose, unless additional benefits to such real property were to be assessed, and which assessment was never made.

The proceeds of this bond issue were expended for construction work without fully completing the drainage system, and the commissioners issued certificates of in-

debtedness which amounted to nearly $8,000, to raise additional funds for that purpose.

When these certificates of indebtedness became due, and were remaining unpaid, the commissioners obtained the passage of a special act by the Legislature, Chap. 607, Local and Private Laws of 1924, authorizing them to issue additional bonds, " in an amount the principal of which, together with the principal of the outstanding bonds of the said district, shall not exceed the sum of the benefits assessed against the lands in the district." Of course, the Legislature could not legally authorize the issuance of additional bonds except to the extent of the assessment of additional benefits that might be made against the lands of the district, for the payment of both the principal of all the bonds and the interest to accrue during the life thereof, since the assessment of such benefits would constitute the sole security for the payment of both the bonds and the accrued interest, the benefits theretofore assessed having been exceeded by the principal and interest of the first bond issue, as heretofore stated. That is to say, the second bond issue would constitute no lien upon the lands unless additional benefits had been assessed; and there is no personal liability on the part of the property owners for the payment of drainage district bonds. Clark v. Pearman et al., 126 Miss. 327, 88 So. 716, and Anderson v. McKee, 182 Miss. 156, 179 So. 858.

The Legislature may have assumed, when it passed this special act, that the commissioners would assess additional benefits if, in their judgment, such benefits had accrued or would accrue, and such assessment was necessary in order to provide for the payment of both of the said bond issues, and the interest accruing thereon. Nevertheless, the Legislature was without authority to authorize the issuance of additional bonds, "in an amount, the principal of which, together with the principal of the outstanding bonds of the district, shall not exceed the sum of the benefits assessed against the

lands," because to do so would impair the contractual rights of the bondholders of the first series to collect both the principal and their interest against the benefits theretofore assessed, except to the extent that the debt exceeded such benefits and was uncollectible.

In other words, in order for the special act in question to have constituted the proper exercise of legislative power, it should have required that the additional bonds to be issued thereunder should be in an amount, the *principal and interest* of which, together with the *principal and interest* of the outstanding bonds, should not exceed the sum of the benefits theretofore assessed, or to be assessed, against the lands.

In the case of Clark v. Pearman, supra, [126 Miss. 327, 88 So. 717], the Court, when discussing the meaning of the statute here involved, said that: "It simply provides that for the payment of both principal and interest of the bonds of the district as well as other evidences of debt issued under the statute the entire revenues of the district are pledged 'in an amount not to exceed the amount of betterments assessed against said lands and railroads.'" And in that case the Court stated, further: "As it appears to the court, there is no escape from the conclusion that under this statute no indebtedness of any character can be incurred, the principal and interest of which will amout to more than the assessed benefits of the district. The plain purpose of the Legislature appears to have been to set aside and pledge alone the assessed benefits for the payment of any and all obligations of the district, including principal and interest, beyond which assessed benefits there was to be no liability whatever of either the district or the landowners thereof." This case was decided in 1921, and by an analogy it is an adjudication of what the rights of these appellants then were under the series of bonds issued herein on April 1, 1920, and which rights were in full force when the Legislature passed the said special act of 1924.

Pursuant to the special act of 1924, the commissioners issued and sold the bonds of the district in the further sum of $9,000, with which to pay the outstanding certificates of indebtedness of approximately $8,000, hereinbefore mentioned, and the expense in connection with the issuance and sale of such bonds, and for the payment of which $9,000, and accrued interest, no additional assessment of benefits has ever been made. The validity of these bonds was approved by the attorneys for the purchaser, and by the state bond attorney, and were thereafter validated by decree of the Chancery Court of Neshoba County on the 16th day of July, 1924, in which decree it was recited, among other things, that "the issuance of said bonds was in strict conformity with law," and that "the amount thereof do not violate any legal limitation."

Moreover, each of the said bonds contains a recital that, "this bond and the others of the series are issued under Chap. 195 of the Laws of Mississippi of 1912, and the amendments to that chapter, and in strict conformity to said laws and in pursuance of the orders of the Board of Commissioners of the said district, . . . , as authorized by the said laws, and upon special assessments and levies of taxes made and to be made"; and that, "It is hereby certified and recited that all acts, conditions and things required by the laws and Constitution of the State of Mississippi to be done precedent to and in the organization of the said district and in the levying of special assessments upon the lands of the said district and in the issuance of this bond, have been properly done, happened and performed, and in due and proper form and time, and that this bond is within the limits prescribed by law."

Then, too, Sec. 25(a) of Chap. 269, Laws 1914, provides: "That the validity of any bonds heretofore or hereafter sold under the provisions of this act shall not be questioned in any court; provided, said bonds are sold as provided in this act, for their face value and the pro-

ceeds of such sale were paid to the county treasurer, or the depository selected by the board of commissioners, to the credit of the district." Moreover, Chap. 280, Laws of 1926, has the effect of validating both series of the bonds here involved, at least to the extent of making them legal obligations of the district in its corporate capacity, as to those issued in excess of the assessed benefits.

In the case of Anderson v. McKee, 182 Miss. 156, 179 So. 858, 859, supra, it was said: "It was held in the case of Anderson v. Robins, 161 Miss. 604, 137 So. 476, 478, 'the Legislature had full power, under the Constitution, to authorize drainage districts to contract debts prior to the assessment of benefits from the proposed drainage scheme to the land of the district, *provided liability therefor is not imposed on the land, or its owners, in excess of the benefits accruing to the land*' (Italics ours.) It follows from this that the Legislature could authorize drainage districts to contract debts subsequent to the assessment of benefits, provided *liability therefor is not imposed on the land or its owners in excess of the benefits accruing to the land*. Where the drainage commissioners were without authority in the first instance to issue any bonds at all in excess of the benefits assessed against the land, as was true in regard to the bonds here in question, the effect of these curative statutes was merely to render such bonds a legal obligation of the district in its corporate capacity enforceable only against such funds or other assets as the district might possess, but did not create a lien on the land."

The bonds of the second series in the instant case having been issued to retire the certificate of indebtedness incurred for constructing an outlet drain or canal from the borders of the district in Pearl River after the full expenditure of the proceeds of the first series, and for the purpose of making effective, completing and preserving the improvements made under the said first bond issue, the commissioners had the right to assess addi-

tional benefits against the lands in the district, if in their judgment further benefits would accrue to the landowners by virtue of such further construction, or if in their judgment it had become necessary to preserve the improvements theretofore made.

The cases of White et al. v. Lake Cormorant Drainage Dist., 130 Miss. 351, 94 So. 235, and Anderson v. McKee, supra, expressly so held. And since the commissioners had such right, and had no right whatever to issue the $9,000 bond issue on August 1, 1924, containing such recitals in each of said bonds as are hereinbefore quoted without first levying an assessment of additional benefits to pay the same, the question is presented on the appeal of the Bank of Philadelphia as to whether or not the said defendant, as de facto depository of the funds of the district, when it paid the said bonds upon presentation out of the revenues collected in taxes on the assessed benefits against the lands therein, had the right to assume that the necessary assessment of additional benefits had been made, in the absence of any notice to the contrary, and where the second bond issue had been validated by a solemn decree of the Chancery Court after their legality had been approved by the attorneys for the district and for the bond purchaser, and also by the state bond attorney.

And in considering this question it should be observed that the lien of drainage bonds first issued does not have priority over that of bonds subsequently issued against additional benefits assessed to complete improvements, as held in the case of First National Bank of Meridian v. Commissioners of Lake Cormorant Drainage Dist., 167 Miss. 354, 147 So. 807, and that, therefore, if such additional benefits had been assessed in such an amount as when added to the former assessment would not have been less than the total of both bond issues and the interest to accrue thereon, then the holders of the bonds of the second series would have been entitled to receive payment of the same from the depository out of

any funds of the district that were available for the payment of the bonds of either series.

The proof discloses without dispute that the defendant Bank of Philadelphia had no actual notice that additional benefits had not been assessed against the lands as a basis for the issuance of the second bond issue when it paid out of the funds of the district the sum of $5,000 due on the principal, and $4,020 on the accrued interest coupons due on said bonds upon their presentation, and which amounts, together with accrued interest from that time to February 1, 1944, equals the sum of $15,975.20 for which the decree was rendered against said bank; and there is neither a case cited nor a text mentioned which holds that it is the duty of a depository of public funds to check the minutes or other records of a body politic to ascertain whether or not the officials thereof have complied with their duty under the law, even in the absence of a court decree validating their acts precedent to, and at the time of, the issuance of such negotiable obligations which recite, as in the instant case, that the same are not in excess of any legal limitation, and that the law has otherwise been complied with.

Moreover, upon the issuance of the additional bonds of $9,000, the commissioners began collecting and placing in the depository bank more tax revenues each year than theretofore, based on an increase of the annual levy from $1.33 per acre to $1.60 per acre on the land, and in the absence of actual notice to the bank as to what was causing the increased deposits from the collection of taxes each year the bank may have reasonably assumed therefrom that additional benefits had been assessed, and from the fact that the law required the assessment of such additional benefits as a condition precedent to the validity of such second bond issue in order that they constitute a liability against the real property of the district.

But it is urged that the bank should be held liable for the amount decreed against it by the trial court, for the reason that it paid certain bonds and interest coupons of

the second series, as heretofore stated, out of the funds derived from the collection of taxes on the assessed benefits which constituted the sole security and fund for the payment of the bonds of the first series, without first requiring the commissioners to enter an order on their minutes in that behalf and issue a warrant for such purpose.

It appears from the evidence that when any of the bonds or interest coupons of either series became due and payable, or shortly prior to their due dates, the three commissioners of the district would leave the meeting which was being held in a room at the bank, and assemble at the window or the office of the bank official, and give instructions that such bonds or interest coupons be paid by the bank and charged to the account of the district, which was accordingly done, without an order having been first entered on the minutes in that behalf, and without any warrant having been issued for that purpose. The precise question is, therefore, presented for decision as to whether or not the bank, even though it may have been entitled to assume that sufficient benefits had been assessed against the lands to provide for the payment of all the bonds and the interest to accrue on both series, became liable to the holders of the unpaid bonds of the first series, on the ground that the bank paid some of the bonds and interest coupons of the second series without first requiring the commissioners to enter a written order on the minutes, and issue a warrant for that purpose.

Sec. 11, Chap. 269, Laws 1914, povides that, "The treasurer shall pay out no money, save upon the order of the board of commissioners, and upon a warrant signed by the president thereof"; also, that, "he shall be allowed a commission of not exceeding one-half of one per cent ($\frac{1}{2}$ of 1%) on all receipts and not exceeding one-half of one per cent ($\frac{1}{2}$ of 1%) on all disbursements, provided, that he shall not be entitled to any commission on money received from the sales of bonds, or of interest bearing certificates, or of any money paid in liquidation

thereof." And this section of the statute provides for the selection of a treasurer by the commissioners. In the instant case they did select one of their own number as treasurer of the district, and the proceeds of the sales of the said bond issues and all the taxes collected against the assessed benefits of the district were deposited in the bank to the credit of the district in the name of its said treasurer.

The said Section 11 of the statute also provides that the tax collector "shall pay the amount due the drainage district over to a drainage depository in his county, if there be one in his county; otherwise he shall pay the same to the drainage [district] treasurer." But it also provides that "the board of commissioners shall, however, select a depository or depositories of the funds of the district in the same manner as provided under chapter 137 of the laws of the State of Mississippi of 1910; and the amendments thereto, and such depository may qualify as a depository of the district in like manner therein required, giving security as therein required, and may place with the treasurer of the district as security for such deposit . . . "

Thus it will be seen that the express requirement of the statute hereinbefore quoted, to the effect that the *treasurer* shall pay out no money, save upon the order of the board of commissioners, and upon a warrant signed by the president thereof, appears to relate to the individual selected by the district as its treasurer. It is further provided in said Sec. 11 that, "All funds coming into the hands of the treasurer belonging to any drainage district organized under this act, shall be deposited in the depository provided for herein, to be drawn out by the proper parties and in the manner above provided."

There was no attempt made by the commissioners to select a depository, and to require the same to qualify as provided by law. They merely agreed with the defendant bank that if it would buy the original bond issue of $33,000 at par, and accrued interest, the funds of the

district would be deposited in the bank without its being required to pay interest as a depository, but more is to be said about this later.

The funds of the district were deposited in the said bank in the name of the district treasurer, including the interest which the bank did, in fact, pay from time to time for the use of such funds, and all disbursements therefrom, covering the payments to the district contractor, mileage and per diem of the commissioners, surety bond premiums, attorneys' fees, and general operating expenses, were made upon warrants duly issued, except in the instances where some of the bonds and coupons of both the first and second series which were paid upon presentation at the bank on the verbal instruction or request of the commissioners assembled at the bank, among whom was the treasurer of the district. When the bank paid these bonds and coupons the same were surrendered to the board of supervisors after being duly cancelled, in order that the clerk of the said board might check the same against his bond register kept for that purpose.

Sec. 8, Chap. 137, Laws 1910, referred to as above stated in Sec. 11, Chap. 269, Laws 1914, provides that: "in the event no bank in the county qualifies as a county depository, as herein provided, the funds belonging to the county shall be kept by the treasurer either in a vault provided for that purpose or on special deposit in some bank in this State, . . . "

Chap. 233, Laws 1920 (now Sec. 4350, Code 1942), provides that: "Whenever any . . . taxing district controlled by the board of supervisors which has heretofore issued, or shall hereafter issue bonds or other obligations of which principal and interest shall be payable at some bank or trust company, or at some office other than the county treasury it shall be the duty of the clerk of the board of supervisors on the allowance of said board to issue a warrant against the proper fund for the amount of principal and interest due and to forward exchange to

the paying agent, said exchange to be sufficient in amount to pay the principal and interest and a reasonable fee to said paying agent for handling the same, said fee not to exceed one-quarter of one per cent. of the amount of coupons paid and one-eighth of one per cent. of the amount of bonds paid. Said exchange shall be forwarded in time to reach the paying agent at least five days prior to the day on which said principal and interest shall become due, and the receipt of the paying agent for said remittance shall be sufficient voucher in the hands of said clerk for said remittance until the bonds or coupons shall have been paid and canceled and returned to said clerk." And it is also further provided in said Chap. 233, Laws 1920, Sec. 4352, Code 1942, that: "In case of a drainage district, the commissioners shall make the allowance and the secretary-treasurer . . . shall forward the funds as above provided for."

In the instant case the bonds of the first series were all payable at the Mercantile Trust Company, St. Louis, Missouri, and those of the second series at the Capital National Bank, at Jackson, Mississippi. In view of the provision hereinbefore quoted, to the effect that the receipt of the paying agent for the remittance to the bondholders shall be sufficient voucher in the hands of the clerk for the remittance until the bonds and coupons have been paid, canceled and returned to the clerk, it would appear that the surrender of the bonds and coupons duly canceled in the instant case should be a sufficient voucher to show such payments in lieu of canceled warrants, since it appears that the purpose of having a canceled warrant is to enable the proper officials to check the credits claimed by the treasurer or a depository of the taxing district against the canceled bonds and coupons, and which may be done against the canceled bonds and coupons returned to the clerk for ultimate delivery to the district where the funds have been paid out by the district treasurer or a depository in payment of the same.

Moreover, there may be ground for saying that the provision of said Sec. 11 of Chap. 269, Laws 1914, to the effect, "that the treasurer shall pay out no money, save upon the order of the board of commissioners, and upon a warrant signed by the president thereof," has for its purpose the preventing of the treasurer of a drainage district from paying out the funds thereof, without the consent and authority of the drainage district commissioners because he is merely one member of the Board, or he may be a third person selected by the commissioners as treasurer. However, it is unnecessary for the purposes of this decision that we decide that precise question in the instant case, and we therefore pretermit a decision thereof, for the reason that this Court has held in the case of Jones Bayou Drainage Dist. v. Sillers, Clark & Sillers, 129 Miss. 13, 91 So. 693, that the appellees were entitled to recover for legal services rendered the district, though no minutes were kept by the drainage commissioners, showing their employment; also, it was held in the case of Tallahatchie Drainage Dist. v. Yocona-Tallahatchie Drainage Dist., 148 Miss. 182, 114 So. 264, 266, where the suit was for the purchase price contracted to be paid by the defendant district to the plaintiff district for engineers' reports, surveys, trucks, surveyors' instruments, and other personal property, at the sum of $130,000, and where the purchasing district had not attempted to bind itself by any order or contract on its minutes in the behalf, that a recovery should be allowed, the Court there saying that the drainage commissioners were not required by the statute (Chap. 195, Laws 1912, as amended by Chap. 269, Laws 1914) to keep minutes of their proceedings.

In the case of Tallahatchie Drainage Dist. v. Yocona-Tallahatchie Dr. Dist., supra, the Court said: "It is true that it is the established doctrine of this state, as held in Amite County v. Mills, 138 Miss. 222, 102 So. 465, 737, Smith [County] v. Mangum, 127 Miss. 192, 89 So. 913, and several other decisions of this Court, that boards of·

supervisors have no implied powers, that all their acts must be expressly authorized by law, and, furthermore, that they can only act through their minutes spread upon the records of their office. We do not think that this is true of drainage commissioners under this statute.'' And in that case the Court further said: ''The duties of drainage commissioners are more largely administrative than governmental; they have no authority to pass ordinances for the government of the district; their main duties are to administer the business affairs of the corporation. Nor are they required by the statutes to keep minutes of their proceedings.''

If it is true, therefore, that the drainage district here in question was not required to keep minutes of its proceedings, it would seem that the appearance of the three commissioners in person, including the treasurer, at the bank when giving verbal instructions to it to pay the bonds and coupons in controversy upon their presentation, was a sufficient authorization to the bank to pay the same; especially where, as in this case, the bank had no notice that the payment was to be made to the holders of bonds not entitled to receive the same. If the bank had the right to assume that sufficient benefits had been assessed to provide for the payment of the bonds and their coupons of both series, it had the further right to assume that there was no priority as between the holders of the unpaid bonds of the first series and the holders of those of the second series, under the authority of the case of First National Bank of Meridian v. Commissioners of Lake Cormorant Drainage Dist., hereinbefore cited.

We are, therefore, of the opinion that the trial court was in error in rendering the decree against the defendant Bank of Philadelphia for the sum of $15,975.20, representing the amount paid out on bonds and coupons of the second series, and the accrued interest thereon to February 1, 1944; that the cases of Bridge Creek Drainage Dist. v. Webster, 168 Miss. 115, 150 So. 915, and

Bank of Hickory v. McPherson, 102 Miss. 852, 59 So. 934, are inapplicable, for the reason that in the case first mentioned the drainage district sued the receiver of a bank at Corinth which had paid out the funds of the district on the obligations of an entirely distinct and separate taxing district, and therefore on an obligation that was not a legal liability of the complaining district even in its corporate capacity. And in the second case, the Bank of Hickory knew both that the fund in question was a trust fund and that the depositor was converting the same to his own personal use. Nor can it be said that any of the other cases relied upon by the appellants are controlling as to the liability of the defendant bank in the case at Bar.

It is further contended, however, that there was bad faith on the part of the defendant bank in connection with the issuance and sale of the bonds of the first series, in that the statutes under consideration required that said bonds should be sold for not less than par, and that the said bank participated in the handling of the sale of said bonds in such manner as to prevent the district from receiving the full par value thereof.

The proof discloses that the defendant bank at first made a bid of only 85% of the par value of the said $33,000 issue of bonds, but that this bid could not be accepted, in view of the legal requirement that they should sell for not less than par value. That thereupon the contractor, A. C. Miller Construction Company, and the commissioners for the district arranged with the said bank to purchase the said bonds at par value and accrued interest, with the understanding that at the instance of the contractor the bank would let some bond-buying concern in St. Louis have the bonds at 85% of their par value, and let the contractor pay to the bank the difference of $4,950.

The proof further shows that the said bank paid into the funds of the said district the sum of $33,627, representing par value and accrued interest, and thereafter

delivered the bonds to the concern in St. Louis, and received therefor 85% of their par value, accepted the note of the contractor, payable to the defendant bank for the sum of $4,950, representing the other 15% of the par value of the bonds, which note was duly enforced by the three commissioners to insure the payment of the note out of the compensation to become due the contractor. That this note was later paid to the defendant bank in full by the contractor.

Also, that some few weeks after this transaction had been consummated the drainage commissioners raised the compensation due the contractor under the terms of his contract to such an extent as to amount to the 15% value of the bonds which the contractor had agreed to pay. That the defendant bank had nothing to do with this later transaction between the commissioners and the contractor, whereby his compensation under the contract was thus raised, and the proof failed to disclose that the bank knew any thing about this transaction on the part of the commissioners and contractor.

The result of the foregoing transaction was that so far as the bank was concerned, the district received the full par value and accrued interest on the bonds; that the subsequent action of the commissioners in raising the compensation in the contract caused the owners of the real property of the district to lose that amount in funds which otherwise would have gone into drainage construction work. However, the drainage district and the said property owners alone, and not the bondholders, can complain of this increase in the contract price originally agreed to be paid to the contractor, since the proceeds of the bond issue do not constitute a fund to which the bondholders were entitled to look for payment of their bonds.

As to the liability of the commissioners and the sureties on their official bonds in the instant case, the complaining bondholders must rely for recovery alone upon the acts of the commissioners in failing to assess sufficient benefits against the lands for the collection of en-

ough taxes to pay their bonds and accrued interest, and, on the fact that they issued and caused to be paid the bonds of the second series out of funds which should have been applied to the payment of those of the first series, under the facts herein stated in relation to the issuance of the second bond issue and the payments made thereon.

It is to be conceded in the outset that in determining the amount of benefits to be assessed against the lands, and in the issuance and sale of the second bond issue without providing for their payment by assessing additional benefits, the commissioners were acting judicially in that behalf; that they had jurisdiction of the subject matter, and were not liable, if they acted in good faith and without fraud or corruption, unless there is a statute so providing; and that if they were acting in a ministerial capacity when causing the bonds and coupons of the second series to be paid out of the funds which should have been devoted to first paying the bonds and coupons of the first series, the individual members of the board of commissioners are not liable to the complainants for the acts and omissions of the board, if they acted in good faith and without fraud or corruption in the absence of a statute so providing; but that if the issuance and sale of the bonds of the said second bond issue was for an object not authorized by law, or if the commissioners authorized the defendant bank to pay out of the funds collected in taxes against the assessment of benefits which was made for the payment of the bonds and accrued interest of the first bond issue, and caused said funds to be paid to an object not authorized by law, they and their sureties may be held liable on account thereof, regardless of their good faith.

Sec. 6, Chap. 269, Laws 1914, authorized the commissioners to have increased the original assessment of benefits in order to pay all of the bonds and accrued interest on either bond issue if, in the exercise of their judgment and discretion, they had found that the lands would be benefited more than the amount of benefits

first assessed, or if they had found that it became, "absolutely necessary . . . to preserve and maintain the improvements [already made]." This section of the statute therefore vested the commissioners with authority to issue the *second series* of bonds, and to assess additional benefits for the payment of the same if, in their judgment, it had either become absolutely necessary to complete, preserve and maintain the improvements already made, or if additional benefits would accrue to the owners of the real property of the district as a result thereof; and they were thereby authorized to issue such bonds for the payment of the certificates of indebtedness heretofore mentioned, if the same were issued on the foregoing grounds.

Having omitted to assess the additional benefits while acting judicially in determining the foregoing questions, they could not be held liable in the instant case for such omission, on the ground that they did not act in good faith, but fraudulently and corruptly, since the proof discloses that these commissioners were proceeding under the advice of reputable attorneys for the district, and the validity of the bonds was approved by the attorneys for the bondbuyers, the state bond attorney, and the decree of the Chancery Court, without requiring the assessment of such additional benefits; that these men knew nothing about the requirements of the law in regard to the circumstances under which drainage bonds could be issued, and it appears that the Chancellor's finding of fact, to the effect that they acted in that regard in good faith, was not manifestly wrong under the evidence. Certainly not as to their failure to levy the additional benefits necessary to make the second bond issue a lien, since they also acted pursuant to the special Act of the legislature which undertook to authorize them to issue additional bonds, the principal of which, when added to the principal of outstanding bonds, would not exceed the benefits assessed. They did not know, and were not advised, that the legislature was without such power.

Moreover, the object to which the proceeds of the second bond issue were to be devoted was one authorized by law, and they had jurisdiction over the subject matter, as hereinbefore stated.

As was said in our leading case in this state, of Paxton v. Baum, 59 Miss. 531: "It is for money appropriated to something for which the law does not permit it to be appropriated at all, in any way or under any circumstances, that members (of the Board of Supervisors) are personally liable. It is for a diversion of money from its legitimate object, and not for an appropriation to a proper object, although in an irregular and unauthorized manner, that liability is imposed on members personally. It is what the money is appropriated to, and not how it is applied, that furnishes the test of personal liability for it. 'Object' signifies the thing aimed at, the end sought to be accomplished. . . . Manifestly it is impossible, after we pass the point of corruption, to draw any line other than that laid down by us, namely, liability where the subject-matter of the appropriation is beyond the jurisdiction of the board; nonliability where the object is within the jurisdiction, but there has been a mistaken exercise of legal power."

The foregoing test has not been departed from under our subsequent decisions, as disclosed in the cases of Bell v. McKinney, 63 Miss. 187; State to Use of Lincoln County v. Green, 111 Miss. 32, 71 So. 171; Pegram v. State, 121 Miss. 564, 83 So. 741; and McNulty v. Vickery, 126 Miss. 341, 88 So. 718. Although the doctrine of these cases was apparently departed from in Miller v. Tucker, 142 Miss. 146, 105 So. 774, the same was expressly reaffirmed in National Surety Co. v. Miller, 155 Miss. 115, 124 So. 251, and Gully v. Bew, 170 Miss. 427, 154 So. 284, 721; and was adhered to in Gully v. McClellan, 170 Miss. 405, 153 So. 524; Gully v. Thomas, 171 Miss. 749, 158 So. 465; State ex rel. Bank of Commerce & Trust Co. v. Forbes, 179 Miss. 1, 174 So. 67; Mississippi Road Supply Co. v. Hester, 185 Miss. 839, 188 So. 281, 124 A. L. R. 574;

Causey, State Auditor, v. Gilbert, 193 Miss. 756, 10 So. (2d) 451; and Barnett v. Lollar, 197 Miss. 574, 19 So. (2d) 748.

And in the case of Pigeon-Thomas Iron Co. v. Leflore County, 135 Miss. 155, 99 So. 677, 680, the board of supervisors let a public contract to build a county bridge, but negligently failed to have the contractor give bond as required by statute. The appellant in that case had furnished steel for the bridge which the contractor failed to pay for, and as there was no contractor's bond to sue upon, it brought suit upon the official bonds of the members of the board, on the idea that recovery might be had from their negligent failure to perform a *ministerial* act. In that case the Court held that there was no liability against the individual members of the board, and said: "In the discharge of the duties imposed upon the board, the members thereof acted in an official and not in an individual capacity, and any neglect or failure in the exercise of its powers or discharge of its duties is the default of the board, and not of the individuals composing it, and they are not liable for such default unless made so by statute."

To the same effect are the decisions of Reese v. Isola State Bank, 140 Miss. 355, 105 So. 636, and Wray v. McMahon, 182 Miss. 592, 182 So. 99.

Therefore, the failure of the Board of Supervisors in the case of Pidgeon-Thomas Iron Co. v. Leflore County, supra, to require the statutory bond for the protection of one furnishing materials may be likened unto the failure of the drainage commissioners, in the case at Bar, to assess the necessary benefits for the protection of all the bondholders, and unto their action in failing to issue warrants for the payment of the bonds and interest coupons in controversy, which they verbally authorized, and instructed the defendant bank to pay in disregard of the statute, which provided that the treasurer shall pay out no money, save upon the order of the board of commissioners, and upon the warrant signed by the president

thereof, except that in the instant case the complainant would have sustained their loss even though an order had been entered and a warrant issued. And this case, together with the two other decisions last above cited, are also authority for the proposition that the failure of the drainage commissioners herein complained of, was the failure of the board, and not of the individual members thereof.

The commissioners rely, however, upon the case of Walton v. Colmer, Dist. Atty., 169 Miss 182, 147 So. 331, 148 So. 635, where the suit was *for the benefit of the county,* and where public funds were lost by reason of the failure of the board of supervisors to perform a ministerial duty to require security for the safety of such funds from a depository which became insolvent. However, in the case of State ex rel. Bank of Commerce & Trust Co. v. Forbes, hereinbefore cited, the Court said that the appellant was relying on the cases of Walton v. Colmer, supra, and Amy v. Supervisors (Burkholder), 11 Wall. 136, 20 L. Ed. 101, and First Nat. Bank v. Filer, 107 Fla. 326, 145 So. 204, 205, 87 A. L. R. 267; and our Court pointed out that [179 Miss. 1, 174 So. 70]; "Walton v. Colmer was an action brought by a district attorney for the benefit of a county against the members of its board of supervisors for the breach of an official duty, and of course has no relevancy here. We are dealing, not with the liability of a member of a board of supervisors to the county itself for the breach of his official duties, but with his liability therefor to a private individual. This distinction was expressly made in McNulty v. Vickery, supra," (referring to one of the Mississippi decisions hereinbefore enumerated); and that in Amy v. Supervisors (Burkholder) a statute made the members of the Board liable, and that in First National Bank v. Filer the Florida Court had "engrafted an exception on the general rule of nonliability of a member of a board for the acts of the board in its corporate capacity." The Court declined to express an opinion in the Forbes case

as to whether such an exception should be recognized where a member of a board personally joins in and lends his efforts towards the accomplishment of the wrongful acts of the body or board itself as an entity, as held by the Florida Court. Moreover, such an exception is contrary to the policy announced in our other decisions on the question; and especially where the suit is brought on behalf of private individuals.

Therefore, the effect of what was said in the Forbes case, in regard to the case of Walton v. Colmer, seems to be that the drainage district itself, in the instant case, would not be bound by, and would be entitled on behalf of the public to relief against, the action of the district treasurer and commissioners in causing these funds to be paid out in a manner contrary to the express provisions of the statute in question, if such action had caused a loss to the public. Whether the district could maintain a suit in that behalf for the benefit of the bondholders, who were entitled to receive the funds, is not here involved, since the district is not suing, but is being sued.

No decision of this Court is cited which would entitle the individual bondholders to recover in the case at bar for the dereliction of official duty by the members of the board of drainage commissioners while acting in good faith and as a corporate body; whereas, in the case of Pidgeon-Thomas Iron Co. v. Leflore County, supra, it appears that the Iron Company, which had furnished steel for the construction of the county bridge was injured by the failure of the board of supervisors to require for its protection a bond from the contractor, and the recovery against the members of the board was denied. But in the instant case the failure of the treasurer and commissioners to issue a warrant for the payments made on the principal and interest of the second bond issue was not the thing that caused the loss to the holders of the bonds of the first series. The latter would have been injured to the same extent if the commissioners had issued a

warrant for paying out the funds in question. The fact that the treasurer and commissioners caused these funds to be paid out at all, whether with or without a warrant issued in that behalf, is the thing that caused injury to the holders of the bonds of the first series.

It is contended, however, that there are statutes which expressly impose liability on the commissioners in the instant case. It has, therefore, become necessary that we examine Secs. 4049, 4344 and 4353, Code 1942, all of which were in force at the time of the acts herein complained of.

The pertinent provisions of Sec. 4049, supra, making any county, county district or municipal officer who has executed bond for the faithful performance of duty liable to the body politic which he is serving, or to any person interested, for knowingly or wilfully failing, neglecting or refusing to perform any duty required of him by law, were in full force and effect when the decision in the case of Paxton v. Baum was rendered, and they were likewise in full force when the other cases hereinbefore mentioned were decided.

Sec. 4344, supra, making officers liable on their official bonds for diverting the *proceeds of any bonds* to a purpose other than that set forth in the original order for the issuance of the same, has no application to the diversions of *tax revenue* collected against the assessed benefits of a drainage district.

And Sec. 4353, supra, making members of the Board of Supervisors, etc., and the commissioners of a drainage district liable on their official bonds to any holder of any bonds or coupons issued by such governing authorities, for their failure or refusal to comply "with the foregoing provisions," is brought forward into the Code of 1942, as Sec. 4, Chap. 233, Laws 1920. The preceding three sections of said chapter are now Secs. 4350, 4351 and 4352 of the said Code, and "the foregoing provisions" referred to deal with the time, manner and method, that is to say, the details or mechanics, of mak-

ing the remittances to the bondholders when any bond or interest coupon shall become due and payable.

In other words, the said Sec. 4353, supra, would make the commissioners liable on their official bonds ''for any and all expenses incident to the collection of same, and for all damages which may have accrued on account of the failure to pay same promptly at the place of payment at maturity,'' where the provisions of the three immediately preceding Code sections have not been complied with in the manner and method of *making the remittances*; while in the instant case the holders of the original bonds are not complaining either in regard to a failure of the governing authorities to issue a warrant in their favor, or to forward exchange to the paying agent against the proper funds for the amount of the principal and interest when due them, including the fee of such agent for handling same, and at the time provided for by the statute, but the complaint is that the said governing authorities paid certain bonds of the second series out of funds collected in taxes against the assessed benefits which were levied for the payment of the bonds of the first series.

We are of the opinion that the said Sec. 4353, supra, does not provide for liability of the commissioners on account of their failure to assess sufficient benefits for the payment of all the bonds and coupons of both series, or because they caused part of the taxes against the benefits assessed to be paid to the holders of the bonds of the second series without first issuing a warrant in that behalf; and especially where the bonds and coupons so paid would have been on an equal basis with those of the first series, if sufficient benefits had been assessed, as required by law.

Finally, it is strongly urged that the funds in the defendant bank were *trust funds,* and that both the bank and the commissioners were under a greater responsibility in regard thereto than a bank would ordinarily owe

to its depositors, or than the commissioners of the district would owe in regard to the general funds thereof.

We are not unmindful of the force of the above contention, but, as hereinbefore shown, the bank had no notice that the funds were being held in trust exclusively for the payment of the bonds of the first series, since it had no notice as aforesaid that sufficient benefits had not been assessed for the payment of both series. First Nat. Bank of Meridian v. Commissioners of Lake Cormorant Drainage Dist., supra. And so far as the commissioners are concerned, they were ignorant of the necessity for assessing additional benefits, and they were either not advised to make such assessment, or were incapable of understanding and carrying out such advice as may have been given them.

Moreover, the case of State, to Use of Lincoln County, v. Green, supra, involved the misapplication of *trust funds* which should have been paid by the appellee into the institute fund, and also involved other school funds. The case of Gully v. McClellan, supra, involved the loan by the board of supervisors of Sixteenth Section Township Funds—that is to say *trust funds*—in violation of statutory provisions in regard to the handling of the same. And the case of Gully v. Bew, supra, involved the loan of such trust fund. And while liability was denied in each of these three cases, on the ground that the officials involved were acting judicially, we are nevertheless confronted with the other line of decisions hereinbefore cited, to the effect that there is no liability on the part of the individual members of a corporate body where they are acting ministerially, if they act in good faith, without fraud, corruption or personal gain, since the act is that of the corporate body, and not that of the individual. And this is also true if the commissioners acted ministerially in paying out the funds in payments to holders of bonds of the second series.

It clearly appears that the acts of the commissioners hereinbefore discussed were not due to bad faith, fraud

or corruption on their part, but rather to their general incompetency, and the failure to obtain, or inability to understand and comply with the legal advice upon which they were entitled to depend for guidance as to the necessity for assessing additional benefits, and as to the relative rights of the respective bondholders.

It is unfortunate, indeed, that innocent investors should lose their savings, but at the same time, it would also be unfair to require that their loss should be made good by either the defendant Bank of Philadelphia, which acted in good faith in carrying out the instructions of the commissioners of the drainage district, and has accounted fully for all of the funds entrusted to it, or that the loss should be paid by these drainage district commissioners, who were men engaged in agricultural pursuits, and unfamiliar with the legal requirements either as to a valid issuance of bonds or the proper disbursement of the funds over which they had jurisdiction, and who also were necessarily dependent upon whatever legal advice they may have received for their guidance.

From the foregoing views it follows that the decree of the trial court should be affirmed as to the non-liability of the commissioners and the surety on their official bonds, and also in all other respects except as to adjudged liability of the defendant Bank of Philadelphia, and except as to the failure of said court to award a decree in favor of the cross-complainant, Inman, for the full amount due him.

The cause will, therefore, be reversed and a judgment rendered here in favor of the appellant Bank of Philadelphia; reversed and remanded as to the appellant, Inman; and affirmed as to the adjudged non-liability of the commissioners and the surety on their official bonds; and also affirmed as to the liability of the drainage district in its corporate capacity, and as to the adjudged priority in favor of the holders of the bonds of the first series against any taxes collected, or to be collected, against the benefits heretofore assessed against the lands

of the district, not disbursed prior to the filing of this suit. It is so ordered.

Affirmed in part; reversed in part; and remanded.

**Smith, C. J.,** dubitante.

**Roberds, J.,** took no part in this decision on account of his relationship to one of the parties.